UNITED STATES of America,
Plaintiff-Appellee,

v.

Thomas LETCHOS, Defendant-Appellant.
No. 13856.

United States Court of Appeals
Seventh Circuit.

May 3, 1963.

Rehearing Denied May 28, 1963.

482

George Cotsirilos, Anna R. Lavin, Chicago, Ill., for appellant.

James P. O'Brien, U. S. Atty., Raymond K. Berg, Asst. U. S. Atty., Chicago, Ill., John Peter Lulinski, John Powers Crowley, Asst. U. S. Attys., of counsel, for appellee.

Before CASTLE, KILEY and SWYGERT, Circuit Judges.

SWYGERT, Circuit Judge.

The defendant, Thomas Letchos, was convicted after trial by jury of the crime of perjury, in violation of Title 18 U.S.C. § 1621. From a judgment entered thereon, defendant appeals.

The alleged perjurious statements of defendant were made during the course of a trial of one Anthony Joseph Accardo wherein Accardo was charged with false statements in his income tax returns in claiming deductions for certain automobile expenses incurred by him as an agent for Premium Beer Sales, Inc. See United States v. Accardo, 298 F.2d 133 (7th Cir., 1962). Prior to the Accardo trial Internal Revenue Service agents interviewed many witnesses in an effort to ascertain the authenticity of Accardo's claim that he was a beer salesman for the years in which he claimed tax deductions. Defendant Letchos was one of those interviewed by agents Conroy and Tobias.

In summary, the evidence, taken most favorably for the government, shows that on January 6, 1960, in an interview held at Tom's Steak House (an establishment owned by the defendant), defendant told the agents that he had been taking Lowenbrau beer since he started in business in June, 1955; that the first order was given to a Joseph Bronge of the West Town Distributors; that he had taken Fox Head beer about July 19, 1956; that Bronge came to him at that time and told defendant he was now handling Fox Head beer, and out of friendship for Bronge, he took some at Bronge's request; that agent Tobias showed defendant some photographs and said, "Here are pictures of two fellows who are presumed to be beer salesmen. Do you know them?"; that defendant said, "I don't know him, but this is Jack Cerone"; that Tobias, pointing to the picture said, "This is the picture of Anthony Accardo, also known as Joe Batters. Now do you know him?" and defendant said, "I still don't know him"; that during the examination of the photographs, Tobias asked defendant if Anthony Accardo had ever been in to sell him beer, to which defendant replied "No"; that Tobias then asked if Anthony Accardo had ever been in the place so far as defendant knew for any purpose, and defendant answered that so far as he knew, he had never been in, that he didn't know him.

The Government introduced into evidence the report of Tobias and Conroy dealing with the interview with defendant, and also the original notes taken by Tobias during the course of the interview. Both agents used these documents prior to trial for the purpose of refreshing their recollections as to the events of January 6, 1960. The Government also introduced a report made prior to this trial of an interview by the Federal Bureau of Investigation of agents Conroy and Tobias concerning the events of January 6, 1960.

At the trial of Anthony Joseph Accardo, Accardo called defendant as a witness and defendant testified in substance that he knew Accardo; that Accardo was employed by Premium Beer in 1956, 1957, and 1958, selling beer; that Accardo made a business call on him in June or July, 1956, and at that time he purchased four cases of Fox Head beer from Accardo, after which the beer driver was instructed to see that he, defendant, had four cases on hand every time the driver

made a call; that Accardo came to defendant's place of business several times a year during 1956, 1957, and 1958.

On cross-examination in the Accardo trial, defendant testified to having had an interview with two agents of the Internal Revenue Service on January 6, 1960, and testified further:

### I.

"Q. Did you not at that time and place, after having been shown a picture of Mr. Accardo and having had the picture identified as Mr. Accardo, tell these two Revenue Agents that you had never seen, never met, never heard of Mr. Accardo?"

"A. I did not."

\*    \*    \*    \*    \*    \*

"Q. Did you not at that time tell these Internal Revenue Agents that you had never seen Mr. Accardo?

"A. No."

### II.

"Q. Did you not tell them that he had never been in your place of business?

"A. No, sir, he is a steady customer. How can I say he never had been in my place of business?

"The Court: Then your answer is no? Is that right? Is that your answer?

"The Witness: No."

### III.

"Q. Did you not tell these Internal Revenue Agents that Accardo had never sold you beer?

"A. No, I never knew Mr. Accardo before he sold me the beer, I told them.

"The Court: Read the question to the witness. (Question read.)

"The Court: What is your answer?

"The Witness: No I never told them that."

### IV.

"Q. Did you not at that time and place, Tom's Steak House, on January 6, 1960, tell Internal Revenue Agents Tobias and Conroy that you had purchased Lowenbrau beer since 1955 from Mr. Joseph Bronge, the West Town Distributing Company, and that when Bronge began handling Fox Head beer, he came in to see you and asked you whether or not you would purchase Fox Head beer, at which time you did?

"A. I did not."

In an effort to impeach defendant's testimony in the Accardo trial agents Conroy and Tobias were called to testify in that case. Their testimony reaffirmed their version of the January 6, 1960, interview summarized above.

On January 31, 1961, defendant Letchos was indicted for perjury for falsely testifying in the Accardo trial that he had not made certain statements to two Internal Revenue Agents. The statements he denied having made were charged as:

"1. That he had never seen Mr. Accardo;

"2. That Mr. Accardo had never been in his place of business;

"3. That Mr. Accardo had never sold him beer;

"4. That he had purchased Lowenbrau beer since 1955 from Joseph Bronge of West Town Distributing Company, and when Bronge began handling Fox Head beer Bronge came in to see him and asked whether or not he would purchase Fox Head beer, at which time he did."

In charging the materiality element, the indictment recites:

"During the course of the (Accardo) trial it became material for the Court and jury to learn whether the said Anthony Joseph Accardo had performed any services for Premium Beer Sales, Inc. during the years 1956, 1957 and 1958. It further became material for the court and jury to learn whether or not certain witnesses who testified on behalf of the said Anthony Joseph Ac-

cardo had previously made statements to agents of the Federal Government which were inconsistent with their testimony in said case."

We begin by saying that we do not believe it can be seriously contested that the evidence supports the conclusion that defendant did make diametrically opposed statements in the investigation interview of January 6, 1960, and during the course of the Accardo trial. The pertinent portions of the Accardo trial transcript were admitted into evidence as Government exhibits in this trial. Agents Tobias and Conroy testified as to what occurred and what was said during the interview, and Government's Exhibit 4, identified as a joint report of agents Conroy and Tobias of their interview with defendant, made two days after the interview, and Government's Exhibit 5, identified as the original notes taken by agent Tobias at the time of the interview, were admitted into evidence.[1]

Defendant contends that the statements which are the basis for the perjury charge lack the element of materiality, which is necessary for conviction. The indictment in the Accardo case was admitted into evidence along with the transcript of the testimony of defendant and agents Conroy and Tobias. As a matter of law the trial judge found the necessary materiality. We believe that conclusion was not based on inferences but rather it is obvious from the evidence introduced in this trial. In United States v. Harris, 311 U.S. 292, 295, 61 S.Ct. 217, 218, 85 L.Ed. 196 (1940), the Supreme Court of the United States said:

"Section 125 of the Criminal Code makes no distinction between the false assertions of the fact of prior statements and the false assertions of any other fact. Nor can we see any reason to make one. As the Government points out, the denial of the fact that certain statements have been made may be equally as clear, deliberate, and material a falsehood as the denial of any other fact. And since statements made to government agents are generally one of the bases upon which criminal proceedings are instituted and indictments returned, such a distinction might substantially impede effective administration of criminal law."

Impeachment of a witness goes to his credibility and questions on cross-examination for this purpose may be material in the sense required for a perjury conviction. Blackmon v. United States, 108 F.2d 572 (5th Cir., 1940). The question here is not the truth or falsity of the prior inconsistent statement. It bears no citation of authorities to show that a mere prior inconsistent statement would not have given rise to a perjury conviction. The question here is whether defendant, while under oath deliberately lied by denying *the fact* of his inconsistent statements, i. e., that he had ever made the inconsistent statements.

Conviction for such lies must follow only after strict adherence to the safeguards erected to protect witnesses from too-ready punishment for mere lapse of memory. "[C]onviction for perjury ought not to rest entirely upon 'an oath against an oath.'" See Weiler v. United States, 323 U.S. 606, 609, 65 S.Ct. 548, 550, 89 L.Ed. 495 (1945). Among the safeguards is the two-witness rule discussed in our recent case of United States v. Nicolletti, 310 F.2d 359 (7th Cir., 1962), also involving a perjury conviction growing out of the Accardo trial.

1. Defendant now contends that the agents' reports (Government Exhibits 4 and 5) should not have been admitted into evidence. The record shows that defendant raised no objection to their admission at the trial and further, that defendant tacitly supported their admission by stressing the use defendant's anticipated strategy would make of the exhibits. In the absence of clear prejudice being demonstrated, we believe defendant has waived his right to attack the admissibility of the evidence at this stage.

■ Agents Tobias and Conroy testified as to the statements made to them by defendant during the interview of January 6, 1960. While they used their notes to refresh their memories, they also testified that they had independent recollection of the events in question. Further, the notes, introduced without objection, tended to corroborate their testimony. The two-witness rule was fully complied with.

■■ We also hold that sufficient evidence was introduced to permit the jury to find the necessary wilfulness. "In order to prove perjury, the prosecution must show that the testimony was willfully given, and willfulness is a question for the jury. Only by a full understanding of the issues on trial at the time the alleged perjury was committed can the jury determine the willfulness of the defendant in giving his testimony." Harrell v. United States, 220 F.2d 516, 520 (5th Cir., 1955).

It was not necessary to retry the Accardo case for the benefit of the jury in the instant case. It was only necessary to introduce sufficient of the evidence and testimony from that case to permit the jury to make a rational decision as to wilfulness. The jury's finding of wilfulness is fully supported by the record in this case.

■ The defendant contends that the closing arguments of the prosecution were grossly prejudicial to the defendant, being appeals to class prejudice on the ground of unusual wealth; to passion; to guilt by association; to prejudices fanned by notoriety. We have read the entire opening and closing final arguments of the prosecution and believe that defendant's contentions are unsound. While isolated remarks, taken out of context, in themselves might call for scrutiny of the record, such scrutiny convinces us that the total effect upon the jury was not such as to incite prejudice, and the statements were within permissive bounds.

■ Finally, defendants argue that the court below committed prejudicial error in failing to grant a new trial upon the discovery that several jurors impaneled in the instant case had made statements during *voir dire* examinations in another case and before another judge which were inconsistent with their *voir dire* response to questions in the present case. The question involved the prospective jurors' ability to weigh witnesses' testimony without giving undue weight to testimony of law enforcement officers merely because of their position. While being examined for the earlier case several jurors indicated that they would give added weight to testimony of law enforcement officers and were excused. This contention was adequately answered by Judge Will in denying defendant's motion for a new trial on this ground.[2]

We find no error. The judgment is affirmed.

2. "The Court: * * *
"With respect to the five jurors who allegedly answered my interrogatory with respect to whether or not they would give more credence or less credence to Internal Revenue or Government Agents than they would to non-official witnesses, if you like, I observed the jury in its response to my interrogatory. In fact, you will recall there was a long—it doesn't appear in the transcript—but there was a very long pause between the question which I asked, and that summary statement in which I said they would not give more or less credence.
"I waited for a considerable time to see if there was any indication on the part of any of the members of the panel that they had any feelings about this. I was not aware at the time that any of them had been interrogated on the same general subject in another case in another court. I don't know what they did in that court room.
"Mr. Cotsirilos [counsel for defendant]: I have it right here, Judge. I want to introduce it in evidence.
"The Court: I read the transcript, and I said I don't know how they appeared there. I do know how they appeared here. I watched them. I was satisfied they were giving me truthful answers, and I do not feel justified in saying that notwithstanding my observations of these people, that I must now conclude that they lied to me in the answers to the

questions which they gave, because all of my observations are to the contrary. All of my observations were that they were taking the voir dire interrogation very seriously, and I think I must say I had the feeling that this was a very conscientious jury overall. I think you gentlemen felt the same as the case concluded.

\* \* \* \* \* \*

"The Court: Well, I must say to you, Mr. Cotsirilos, that nothing that I observed in the court room with respect to these jurors would warrant me in concluding they were in any respect not completely qualified and that their deliberations in this case were not consistent with the answers which they gave to all of us, as we all asked them questions on the voir dire and accepted them only after those questions had been answered.

"As a matter of fact, as I recall it, nobody used all the peremptory challenges to which they were entitled. We were satisfied with this jury on the basis of their performance here with a minimum of peremptory challenges.

\* \* \* \* \* \*

"The Court: Let me add one further alternative possibility, Mr. Cotsirilos, which you have alluded to and which I think may actually be the truth. That is, as a result of the rather vigorous reaction with respect to indications that they might give more credence to the testimony of a Government agent, that even over the short period of time, over a weekend, these jurors concluded that this was an erroneous position to take, and that they answered truthfully in Judge Perry's court room on Friday, and they answered truthfully here the following Monday.

"In fact, and I must say to you that you recall the voir dire, you will recall the carefulness with which all of us went into the various questions which were asked, and my feeling was that, and it is today, that this jury, as I observed them in the conduct of the voir dire and subsequently in their deliberations and in listening to the case, in their attitude in the course of the presentation of this, it was a very conscientious jury. \* \* \* "