**UNITED STATES of America**

v.

**James MILLER, a/k/a Frank James Coppola.**

**Cr. No. 11191.**

United States District Court
D. Connecticut.

March 28, 1968.

Jon O. Newman, U. S. Atty., Hartford, Conn., for the United States.

W. Paul Flynn, New Haven, Conn., Richard H. Simons, Gerald F. Stevens, Milford, Conn., Percy Foreman, Houston, Tex., Steven B. Duke, New Haven, Conn., for defendant.

Curtiss K. Thompson, New Haven, Conn., for W. Paul Flynn.

Richard Jacobs, New Haven, Conn., for defendant Miller.

Allen H. Duffy, New Haven, Conn., for Richard H. Simons and Steven B. Duke.

Charles Gill, New Haven, Conn., and Donald G. Walsh, New Haven, Conn., for Richard B. Lane and Virginia Samon.

## RULING ON ORDER TO SHOW CAUSE

BLUMENFELD, District Judge.

This is an application for an injunction to restrain the defendant, James Miller, his attorneys and their investigators from interviewing any members of the petit jury which on June 2, 1966, returned a verdict of guilty on an indictment charging the defendant with violation of 21 U.S.C. §§ 173, 174.

Eighteen months after the verdict, on December 2, 1967, the defendant and his counsel through private investigators employed by them undertook to interview all of the members of that jury. When this activity was brought to the attention of the court, an order to show cause why they should not be enjoined from making inquiry of any of those jurors was issued. The defendants filed responses and a hearing has been held.

It is important to recall what preceded their recent interrogation of the jurors in order to put the present proceeding in perspective. Nothing to the contrary having been shown, I take the legal and factual situation at the time the defendants commenced their inquiry to have been as stated in Part VI of the opinion by the Court of Appeals in affirming the conviction of U. S. v. Miller, 381 F.2d 529, 538–540 (2d Cir. 1967).

"VI.

"When the trial was in its fourth week, the deputy clerk advised the judge that someone had talked to a juror about the case at a social gathering. The judge immediately brought the matter to the attention of counsel; defense counsel requested him to make inquiry without counsel being present and suggested that this be deferred for a short time until the taking of evidence was concluded and that the juror be cautioned in the meanwhile not to discuss the matter. When the judge spoke to the juror, it was discovered that he had already mentioned the incident to two others, like him residents of Litchfield, Conn., with whom he drove to court; the judge instructed him not to discuss it further and to give similar instructions to the two other jurors.

"After the taking of evidence had ended, the judge called the three jurors into his chambers. The juror reported that a man serving drinks at a cocktail party had said, 'I'm just going to warn you that another man in Litchfield told me that when this is over, that unless you're very careful that there is a bunch in Torrington who are going to get after you and beat you up. They don't want to kill you, but they don't like what is going on.' After pointing out that such a remark might have been intended either to intimidate a juror or to cause him to stiffen up, the judge inquired whether it would affect the decision of any of the three. All answered in the negative and assured the judge that no other jurors knew of the incident. The juror to whom the remark had been made then said he thought one of the others 'should mention something about that place over there.' This juror said there were two places in Torrington where his grandsons reported dope was being sold. He added 'that doesn't affect me any, only to the extent I have grandsons, and so forth,' the suggestion apparently being that the judge should bring the matter to the attention of the authorities in order to stop further sales. On further questioning this juror affirmed, 'It has nothing to do with me. I will say it the way I see it.' On returning to court the judge denied a defense motion for a mistrial.

" * * * Here there is no basis for doubting the ability of the three jurors to exercise the fair judgment they promised. The only way in which the judge might have handled the matter better would have been by interviewing the jurors individually as he had indicated he would, since this would have somewhat reduced the risk of a juror's being unwilling to admit susceptibility to extraneous influence. However, we cannot regard the joint interview as a misuse of the wide discretion accorded him. While the written motion for a new trial complained that the opportunity to cross-examine the three jurors was not granted or afforded defense counsel, that had been expressly waived in favor of inquiry by the judge. At the argument on the motion defense counsel referred to his attempts to interview the jurors, their consulting an attorney, and a suggestion by someone, presumably the attorney, that any interviews be held in abeyance pending an order from the judge; he sought a two week adjournment to permit such interviews. The judge declined to grant this and denied the motion for a new trial. We find no error in this. * * * Here the judge had developed the facts by interrogating the jurors, with counsel agreeing not to be present; there was thus no occasion for subjecting the jurors to a further inquiry. Cf. United States v. Crosby, 294 F.2d 928, 949–950 (2 Cir. 1961), cert. denied sub nom. Mittelman v. United States, 368 U.S. 984 [82 S.Ct. 599, 7 L.Ed.2d 523] (1962); United States v. Dardi, 330 F.2d 316, 332 (2 Cir.), cert. denied, 379 U.S. 845 [85 S.Ct. 50, 13 L.Ed.2d 50] (1964)."

Subsequently, on September 27, 1967, the defendant made a motion for a new trial grounded on newly discovered evidence. This motion was denied on November 21, 1967. United States v. Miller, 277 F.Supp. 200 (D.Conn.).

The next move by the defendant was on a course of conduct which precipitated the issuance of the order to show cause now being considered. What occurred within a few days after the motion for a new trial was denied is sufficiently recounted in the defendants' own brief which they filed in this proceeding, excerpts from which follow:

"On Friday, December 1, 1967, one of the attorneys for James Miller, Mr. Richard Simons, met with Virginia Samon, a private investigator employed by the Diamond Detective Agency, 11 Beacon Street, Boston, Massachusetts. Miss Samon was instructed by Mr. Simons to contact some or all of the persons who served as jurors in the case of United States v. Miller and to inquire of them whether they knew of the threats in the case and whether they were influenced thereby. Miss Samon was told by Mr. Simons not to ask the jurors about anything other than the threats and that if they insisted on discussing other aspects of the case, to leave if and when she politely could.

"Later on the same day Miss Samon met with Mr. Duke, also one of the attorneys for James Miller. Mr. Duke discussed the threats with her, gave her a copy of the petition for certiorari, discussed with her his theory about the threats and gave her a copy of the transcript of the colloquy between the judge and the three jurors [during the trial]. * * * He pencilled a number of questions in the margin of the transcript. Mr. Duke instructed Miss Samon to introduce herself as a private investigator. He also told her that if any jurors were reluctant to discuss the threats with her, she should inform them that the United States Attorney had stated in open court that the defense was free to investigate the matter, and that if they had any doubts, they should call the United States Attorney.

"On December 2, 1967, Miss Samon contacted five persons who had served

as jurors. Among them were the three who had acknowledged at the trial that they were aware of the threats. She attempted to ask them about the threats, but some were unwilling to discuss the case at all. * * *

"The evening after the first day's investigation, Miss Samon reported to Mr. Duke. She also told him that she was introducing herself as a private investigator working for Professor Duke of the Yale Law School, one of the attorneys working on the appeal. After assuring himself that Miss Samon was making clear to the jurors that she was not engaged in scholarly research, but that Professor Duke was acting in the capacity of an attorney, he approved her method of introduction.[1] Thereafter, as on the first day, Miss Samon continued to introduce herself as aforesaid.

"On December 3, Miss Samon saw one or two more jurors.

"Some time between December 4 and December 10, Mr. Duke prepared two sets of questionnaire-form instructions for Miss Samon. One set was for the three jurors who discussed the threats with the judge during the trial. The other set was for all other jurors contacted. * * *

"The investigation was continued on December 17 and 18, 1967, with Miss Samon using the questionnaires prepared by Mr. Duke. Since some of the questions related to matters which had been discovered in the earlier part of the investigation, Miss Samon was directed to return to jurors already contacted and to attempt to get answers to the new questions from them. She contacted several jurors that weekend, bringing the total number contacted to 8 or 9." (Memorandum Re Order to Show Cause, pp. 2–3.)

As always it is important to reach the precise question presented. One path to that end is to note what is not involved. It is not disputed that out-of-court statements made to a juror during the course of a trial may, if prejudicial to a losing party, warrant a new trial, cf. Remmer v. United States, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), nor that testimony of jurors is admissible to prove that improper statements have been communicated to a juror. Cf. Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892); Remmer v. United States, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654. But these rules do not deal with the questions to what extent and by what method a losing litigant may undertake direct inquiries of jurors after they have given their verdict. These are separate questions presented by this application for an injunction.

### The Extent of Inquiry

Miss Samon, the investigator employed by the defendant, was instructed by Attorney Simons and Attorney Duke before she went out to interview the jurors. In complying with those instructions, she sought to obtain answers to two questions: (1) How were the threats communicated to you? (2) What effect did they have? It is obvious that the first has to do with the manner in which an extraneous communication, possibly prejudicial, had reached a juror. The second probes into matter resting in his personal consciousness. The consequence of this differential analysis is a sharp discrimination in favor of the use of the answer to one and against the use, in any sphere, of the answer to the second.

In pointing out this basic distinction between what may and what may not be established by the testimony of jurors to set aside a verdict, the Supreme Court in Mattox v. United States, 146 U.S. at 149, 13 S.Ct. at 53, approved "as conformable to right and reason and sustained by the weight of authority" the rule as expressed in Woodward v.

---

1. Mr. Steven Duke is indeed a Professor of Law at the Yale Law School.

Leavitt, 107 Mass. 453 (quoted by the Supreme Court in *Mattox* at 149, 13 S.Ct. at 53):

> "that, on a motion for a new trial on the ground of bias on the part of one of the jurors, the evidence of jurors as to the motives and influences which affected their deliberations, is inadmissible either to impeach or to support the verdict. But a juryman may testify to any facts bearing upon the question of the existence of any extraneous influence, *although not as to how far that influence operated upon his mind.* So a juryman may testify in denial or explanation of acts or declarations outside of the jury room, where evidence of such acts has been given as ground for a new trial." (Italics added.)

See also Wheaton v. United States, 133 F.2d 522, 526 (8th Cir. 1943).

The defendants' own brief discloses that they are aware of the distinction and of the underlying basis for it. They say:

> "Of course, not all evidence which could conceivably be obtained from jurors is admissible in court. A clear distinction should be drawn between evidence relating to improper communications and a juror's impeachment of the verdict by testifying to the reasoning processes of himself or others, or by claiming that he or someone else misunderstood the evidence or the instructions. Such testimony is rarely admissible because it would encourage losing parties to bring improper influences to bear upon former jurors, permit harassment and make it virtually impossible to determine disputes with finality. Further, public revelation of reasoning processes, debates and deliberations would hinder free discussion in the jury room, deter citizens from serving on juries, and bring the jury system and the courts into disrepute." (Memorandum Re Order to Show Cause, p. 8.)

From Miss Samon's testimony and affidavit, and from the list of questions prepared by Mr. Duke for her guidance in interrogating the jurors, it is clear that her discussions with the jurors spilled over into areas which touched upon the jurors' reactions to many facts and circumstances other than their awareness of the extraneous communication relating to the case. This was not inadvertent—Mr. Simons instructed her to seek answers to two questions: (1) How were the threats communicated to you? (2) What effect did they have? Several of the questions Mr. Duke instructed her to ask blurred the distinction between whether there was a receipt of a communication from an outside source and what effect any such communication had on the minds of the jurors. One question on the list he gave her to be used when interviewing the three jurors who did know of the rumor of a "threat" read:

> "12. When you have discussed the threats with any of the other 9 jurors, what have you said about them? How did the other juror or jurors react? (names and date of conversations, proximity to trial, if possible)"

This question carried at the very least, an implication of misconduct by those jurors—since they had been instructed by the court during the trial not to discuss the matter with any of the other jurors. It does not appear to relate to "acts or declarations outside of the jury room." Mattox v. United States, 146 U.S. at 149, 13 S.Ct. at 53. And the questions to be posed to the 9 remaining jurors all proceeded on the assumption that they had heard of the rumored threat before the verdict. In spite of inquiries put to 5 or 6 of the other jurors, none of them has made an affidavit or is reported to have said that he or she knew of the rumored threat prior to the rendition of the verdict.

### *The Jury*

The dominant importance of the jury as an institution for assuring the justice of our method for determining facts and rendering verdicts in the oper-

ation of our judicial system is conspicuously stressed by the constitutional requirements of art. III, § 2, cl. 3, and the sixth and seventh amendments for trial by jury. Its unique character has been described by Mr. Justice William O. Douglas in his Almanac of Liberty, p. 112 (1954) as follows:

> "A jury reflects the attitudes and mores of the community from which it is drawn. It lives only for the day and does justice according to its lights. The group of twelve, who are drawn to hear a case, makes the decision and melts away. It is not present the next day to be criticized. It is the one governmental agency that has no ambition. It is as human as the people who make it up. It is sometimes the victim of passion. But it also takes the sharp edges off a law and uses conscience to ameliorate a hardship. Since it is of and from the community, it gives the law an acceptance which verdicts of judges could not do."

A jury is not required to elaborate its answer, and its ratiocination may not be probed, either secretly by recording or listening to them while they are deliberating, 18 U.S.C. § 1508, or by questioning them about it in open court after they have rendered their verdict. Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917.

Its independence from outside interference in the performance of its duty is protected by the imposition of criminal sanctions, 18 U.S.C. §§ 1503, 1504 (obstructing justice), and of civil liability, 42 U.S.C. § 1985(2) (intimidation) upon those who would interfere. Despite this immense trouble which is taken to protect a trial jury from being given knowledge of any outside information from which it might draw a false inference, such information does occasionally penetrate the net of protection with which they are surrounded. Then the need arises to balance the value of keeping the jurors inarticulate and of ascertaining whether harmful outside information was received by them.

### The Issue

The question presented is how to chart a course that permits jurors' testimony to be obtained to establish improper communications while at the same time insulating them from the harassment of unlimited post-trial inquiry.

The defendants contend for an unrestricted right to investigate: "The defense is entitled to ordinary advantages of investigative technique and to the relaxed atmosphere of an interview in a place and at a time convenient to the witness." [2] (Memorandum Re Order to Show Cause, p. 14.)

Trimming the defendants' argument down to the area where it merits consideration, I take it to be this: If a juror's affidavit that an extraneous communication, possibly prejudicial, has come to his attention during the trial may be used to support a motion for further inquiry into the matter in a court proceeding, it follows that jurors must always be open to unrestricted post-verdict inquiry and investigation. While this may be tenable, I do not share it.

The point is made that without such inquiry extraneous communications will never come to light. But let us observe the matter more closely. Perhaps not all jurors will in every case report such communications during the trial of a case. However, the number of cases in which possibly prejudicial communications appear to have been voluntarily reported to the court or the parties furnishes a strong indication that a jury is not only the conscience of the community, but that the individual jurors are themselves men and women of good conscience.

---

**2.** Indeed, every effort to employ that technique was followed here. Miss Samon, a young, attractive, and skillful investigator, was able to put most of her subjects at ease. The approach she adopted would tend to minimize whatever awareness they may have had of their privilege not to disclose any information about their state of mind or what transpired in the jury room. Cf. Escobedo v. Illinois, 378 U.S. 478, 84 S. Ct. 1758, 12 L.Ed.2d 977 (1964).

Furthermore, to encourage the jurors in this case to promptly come forward with information of any attempt made to exert any extraneous influence upon them, the court instructed them at the end of the very first day of trial as follows:

"Before you go, I instruct you that you are not to talk about this case to anyone, not even among yourselves, and not to permit anyone to talk to you about it. If anyone should approach you or should commence to talk about it in your presence, or if anyone puts himself in a position to communicate with you about this case, report it to me." (Then followed some instructions to avoid paying any attention to reports about the case in the newspapers or on the radio and television, following which the court concluded:)

"I shan't repeat this every day, but I may from time to time. It is a continuing instruction, and please abide by it." (Trial transcript, pp. 55–56, May 3, 1966.) [3]

While there is no need to theorize whether instructions of this nature may always serve to flush extraneous communications to a juror into the open, the fact is that in this case, as in Remmer v. United States, 347 U.S. at 228, 74 S.Ct. 450, a juror did report the incident to the judge.[4]

And staying with the case at hand puts the answer to the question raised by this proceeding on objectively firmer ground. It is clear that the two questions which Mr. Simons instructed Miss Samon to put to all jurors, and the set of 18 questions for the 3 jurors who knew about the rumored threat as well as the set of 11 questions [5] for the other jurors which Mr. Duke instructed her to ask were in no way related to a search for new communications. Primarily they were designed to elicit what effect the communication already disclosed had on them during their deliberations.

■ The defendants make the argument that jury interrogation is not all of one kind. True, the levels at which an inquiry is conducted may be distinguished. But in this case, the trial court had the duty of further inquiry concerning the out-of-court statement to the juror. It was the court's primary responsibility to consider the realities of the situation and determine whether the communication was likely to have a prejudicial effect upon the impartiality of those jurors. Cf. United States ex rel. Bloeth v. Denno, 313 F.2d 364 (2d Cir.) (en banc), cert. denied, 372 U.S. 978, 83 S.Ct. 1112, 10 L.Ed.2d 143 (1963). The manner in which this was done and the determination the court reached were squarely tested and affirmed on appeal. United States v. Miller, 381 F.2d 529. The Court of Appeals decided that "there was thus no occasion for subjecting the jurors to further inquiry." (at 540.) For me that became the law of the case. It appears, however, not to have been sufficiently reliable guidance to counsel for the defendant. Cf. Dictograph Products Co. v. Sonotone Corp., 230 F.2d 131, 134–136 (2d Cir.), petition for cert. dismissed

---

3. Two days later: "I think we will suspend at this point for the day. I haven't cautioned the jury for a few days, but I hope you will remember my instructions to you about not permitting anyone to talk to you about the case. * * *" (Trial Tr. p. 506, May 5.) At adjournment for the day on May 10th: "And the jury will bear in mind the caution that I have expressed every day to you: Don't talk about the case, don't permit anyone to talk to you about it." (Trial Tr. p. 891.) See also Trial Tr. pp. 1720–1722, and Trial Tr. p. 2125 on May 19th. Shep-

pard v. Maxwell, 384 U.S. 333, 358, 86 S.Ct. 1507, 1520, 16 L.Ed.2d 600 (1966) suggests that such instructions should "have been sufficient to guarantee [Miller] a fair trial."

4. But cf. Parker v. Gladden, 385 U.S. 363, 366, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966) (dissenting opinion).

5. Undoubtedly one is faced with formidable problems of communication in trying to assess what went on in another person's mind. The likelihood is that many questions may be necessary.

per stipulation, 352 U.S. 883, 77 S.Ct. 104, 1 L.Ed.2d 82 (1956).

The fact that a jury has been discharged from further service in a case after it has rendered a verdict does not bring to an end the safeguard of the court's protection against inquiry into their deliberations. United States v. Driscoll, 276 F.Supp. 333 (S.D.N.Y. 1967); United States v. Dardi, 330 F.2d 316, 332 (2d Cir.), cert. denied, 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50 (1964). The values to be protected by insulating jurors against post-verdict inquiry into their motives for decision have been well stated by Circuit Judge J. Joseph Smith, whose judicial experience embraces some twenty years' service as a trial judge in the federal system:

"There are many cogent reasons militating against post-verdict inquiry into jurors' motives for decision. The jurors themselves ought not be subjected to harassment; the courts ought not be burdened with large numbers of applications mostly without real merit; the chances and temptations for tampering ought not be increased; verdicts ought not be made so uncertain. Whenever information erroneously reaches the ears of the jury in open court, the judge's instruction to disregard it may be disobeyed; yet it is not suggested that in such a case the jury ought be polled as to whether any of them relied on the forbidden knowledge. Even though presumably the jurors themselves know best, the question is determined, as is the question whether an error was prejudicial, on the basis of the nature of the matter and its probable effect on a hypothetical average jury. The same reasons apply when the improper knowledge reached the jury outside the courtroom. It was not error to refuse to examine the jurors as to their mental processes." United States v. Crosby, 294 F.2d 928, 950 (2d Cir. 1961), cert. denied, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962).

See also Memorandum Re Order to Show Cause, p. 8 (supra at 7-8).

If third-hand rumors of ambiguous threats from unknown sources would always require a mistrial—or a new trial where discovered only after verdict—sinister or even innocently meddlesome persons could, with a few words, make a shambles of the jury system. See McDonald v. Pless, 238 U.S. 264, 267–268, 35 S.Ct. 783, 59 L.Ed. 1300 (1915).

To maintain the integrity of our jury system for reaching final decisions requires that its internal process shall be inviolable, even in court proceedings. Any inquiry outside that area which may be permitted of them ought be adequately restricted to safeguard that integrity. The objectives of the safeguard lie primarily in the protection of their integrity and independence, rather than in the reliability of the processes for determining their verdict. See Stein v. People of State of New York, 346 U.S. 156, 178, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953) and cases there cited. It is far-fetched to assume, even arguendo, that the particular information sought by the post-trial inquisition of the jurors undertaken in this case justified it, but since that inquiry has been conducted, the question is how it should have been done. This is plainly a question of method.

### The Method of Inquiry

A balance between those understandable values which are safeguarded by forbidding post-verdict interrogation of jurors against the right of an accused to protection from possible harmful effect of outside communications to a jury can best be realized by requiring that an application for permission to make any post-verdict inquiry of jurors be made to the court. The inquiry itself ought preferably be conducted in open court. In this district, the voir dire examination of jurors for qualification, bias or prejudice for the purpose of intelligent exercise of challenges for cause or pre-emptorily is in writing to the court, who then asks those questions which are appropriate to the circumstances of the case for which

a jury is being selected. Perhaps inquiry by deposition on notice from the court might be appropriate in some cases. That method would also serve to insure that the interrogation would be made by lawyers,[6] who could be expected to confine their questions to the limited area within which the juror was a witness as distinguished from happenings in the jury room concerning which his role was that of a juror. Under either method, there would be an incontestable record. These two methods are permissible in a proper case.

The one adopted by the defendants was not. At least one juror was provoked, even by Miss Samon, to become "very angry" when she paid him a return visit at his home on a weekend. This in turn induced the juror's wife, while in her husband's presence, to apologize to Miss Samon for his outburst. It appears he was harassed from two sides. More than one interview was conducted in the presence of a juror's wife who interjected some remarks into the discussion. Another one of the 3 who knew of the rumored "threat" refused to discuss the case. This did not deter Miss Samon from making another visit to him to get him to talk.

■ Any person unwilling to submit to an interview "may insist that his views or testimony be given only upon deposition or at a trial or other court proceeding * * *." Devlin v. Rosman, 205 So.2d 346, 347 (D.Ct.App.Fla.1967) (per curiam). A juror ought not even be burdened with the necessity of insisting that he does not wish to be interviewed. Leaving jurors at the mercy of investigators for both sides to probe into their conduct would make the already difficult task of obtaining competent citizens willing to serve as jurors well nigh impossible. In this case, the whole purpose of the jury investigation

conducted by the defendants was to rake up the past in an effort to find some basis for reading into it some features which the defense would like to stress on another motion for a new trial. The line of inquiry to the jurors who knew of the rumored "threat" comes perilously close to an attempt to challenge the integrity of their assurances of impartiality to the court. But the credibility of a juror's statement about that was a collateral factor, cf. United States v. Mentesana, 305 F.2d 214, 216 (2d Cir. 1962), cert. denied, 375 U.S. 848, 84 S.Ct. 102, 11 L.Ed.2d 75 (1963), to the larger issue which called for an assessment of whether, under all the circumstances, what he had heard would be likely to impair his honest impartiality. That issue was for the court, see United States ex rel. Bloeth v. Denno, 313 F.2d at 372 and in resolving it at the time it arose, demeanor evidence was taken into account. Cf. United States v. Letchos, 316 F.2d 481, 485 (7th Cir.), cert. denied, 375 U.S. 824, 84 S.Ct. 65, 11 L.Ed.2d 57 (1963).

### The Conduct of Defendant's Counsel

At the hearing, the court did not ask for nor did Mr. Newman insist on producing juror No. 5 who had reported to him that on a Sunday two women had come to his home and said that at the request of a professor of the Yale Law School they wanted to talk to him and ask him how he felt about the Miller case. It is not important to pin this down. Miss Samon's affidavit and her testimony make it clear that the scope of the juror inquiry was intended to and did extend into matters which could not be received as evidence because of a rule that is designed to protect the public interest. A formulation of the rule is found in Rule 11(d) among the local Rules of Civil Procedure.[7] The defendants argue that because two other Civil Rules are expressly made applicable to criminal cases it would

---

**6.** Distortion can more readily occur in the absence of counsel's aid.

**7.** Rule 11(d) *"Secrecy of Jury Deliberations."* Jurors shall not at any time be

inquired of by counsel or any other persons, or answer, as to the deliberations or the vote of any individual juror at any stage of the jury's deliberations except in a proceeding in open court."

not be fair to hold that Rule 11 should be held applicable to criminal cases by implication. Mr. Newman expresses the same view. I agree that it would be manifestly unfair to extend that rule to this criminal case for the first time as a ground for censuring the conduct of counsel. Also the Court of Appeals statement that "there was thus no occasion for subjecting the jurors to further inquiry" (381 F.2d at 540) may well be read in the context of the inquiry by the court during the trial. The question of future inquiry by counsel for the defense was not in issue.

■ One would be doing rather less than justice to the defendant's counsel if one were to suggest that directing inquiry into what effect the rumored threat had upon the jurors arose out of counsel's oversight of the judicial rule which would require the court to reject the evidence they sought to obtain.[8] Mattox v. United States, 146 U.S. 140, 13 S. Ct. 50, 36 L.Ed. 917. However, I am satisfied that this came about because of the fervent belief in their cause that comes with involvement, rather than from any intention to proceed without any regard for nice distinctions which the cases have expressed. Their immediate and voluntary cessation of the jury investigation when the order to show cause was served upon them fortifies my opinion that they acted in good faith. No disciplinary action is called for under these circumstances.

■ However, an injunction should issue. Accordingly, the defendant, James Miller; his counsel, Steven Duke, W. Paul Flynn, and Richard H. Simons; and Richard B. Lane and Virginia Samon; and their agents, investigators, representatives, employees and attorneys, and all persons acting at their request or direction, are enjoined from making any inquiry of any of the jurors who comprised the petit jury which heard and decided the above captioned case, except upon further order of the court.

The foregoing constitutes the court's finding of facts and conclusions of law.

So ordered.

## ADDENDUM

### I.

Before the defendants filed their responses to the order to show cause, they filed other motions. One was a Motion to Confirm Right of Defense to Investigate. As I observed at the hearing, that presented the other side of the coin to the order to show cause why the defendants should not be enjoined from further investigation of the jury. Accordingly, that motion is denied.

### II.

The defendant Miller has also filed an Amendment of Motion for New Trial. This is grounded on allegations to the effect that the defendant was adversely prejudiced by the same communication to the jurors discussed above. Accompanying that motion was an Application for Issuance of Subpoenae to jurors 6, 8 and 9, those who knew of the communication. The ground for this application is stated, "there is on file a motion for new trial alleging that there was actual prejudice to the defendant by the communication of an alleged threat to jurors 6, 8 and 9 in the above styled cause."

■ It is not clear whether the scope of the Amendment to Motion for New Trial extends beyond what was before the Court of Appeals for decision in United States v. Miller, or is merely an attempt to explore the jurors' reactions to the extraneous communication in greater depth. Whichever it may develop into after hearing is had on it, there are valid reasons why the court should not consider the motion at this time. No harm can result from preserving the status quo for a time. The mandate of the Court of Appeals has been stayed under its Rule

---

8. There is little doubt that such conduct by an officer of the court may be proscribed, Sheppard v. Maxwell, 384 U.S. 361, 86 S.Ct. 1507, 16 L.Ed.2d 600, and even punished as contempt. 18 U.S.C. § 401(2).

28. The defendant is at liberty under bond. He has already had the benefit of some interview with the 3 jurors. And Miss Samon's affidavit appended to the motion in this court was presented to the Supreme Court along with a brief in support of his application for certiorari. Miller v. United States, petition for cert. filed, 36 U.S.L.W. 3229 (U.S. Nov. 24, 1967) (No. 857). I deem it advisable to defer acting on the motion until after the defendant's application for certiorari has been acted upon.