**GOVERNMENT OF THE VIRGIN ISLANDS, Plaintiff**

**v.**

**BEAUMONT GEREAU, ISHMAEL LA BEET, WARREN BALLENTINE, MERAL SMITH, RAPHAEL JOSEPH, Defendants**

Crim. No. 97-1972

District Court of the Virgin Islands

Div. of St. Croix

September 24, 1973

169

JULIO BRADY, ESQ., United States Attorney, Christiansted, St. Croix, V.I., *for plaintiff*

MARIO N. DECHABERT, ESQ., Christiansted, St. Croix, V.I., *for defendant Gereau*

WILLIAM M. KUNSTLER, ESQ., New York, N.Y., *for defendant Gereau*

RONALD T. MITCHELL, ESQ., St. Thomas, V.I., *for defendant La Beet*

CHAUNCEY ESKRIDGE, ESQ., Chicago, Illinois, *for defendant La Beet*

LEROY MERCER, ESQ., Christiansted, St. Croix, V.I., *for defendant Ballentine*

MARGARET L. RATNER, ESQ., New York, N.Y., *for defendant Ballentine*

LEROY MERCER, ESQ., Christiansted, St. Croix, V.I., *for defendant Smith*

RONALD T. MITCHELL, ESQ., St. Thomas, V.I., *for defendant Joseph*

YOUNG, *District Judge*

## I. PRELIMINARY MATTERS

By motion dated August 15, 1973, defendants moved for a "prompt" evidentiary hearing into certain allegations of jury tampering, and for a new trial. This motion was supported by the affidavits of two of the jurors in this case and by sundry other allegations of misconduct which had

come to the attention of the defense attorneys. At the time of this motion I was off island and unavailable. Chief Judge Almeric L. Christian appointed Municipal Judge John D. Marsh as a Master to hold a full evidentiary hearing into the various allegations. I now have before me Judge Marsh's findings of fact and recommendation dated September 21, 1973. On the basis of his findings, I conclude, for reasons to be discussed below, that the defendants are not entitled to a new trial. Therefore the motion for a new trial is DENIED. Before discussing my reasons for this determination, there are three preliminary matters I must dispose of.

First, I have before me a motion filed September 6, 1973, in which defendants La Beet and Ballentine, through their attorneys William Kunstler and Margaret Ratner (but not the other defendants), have for the third time during this proceeding moved the Court to recuse itself, pursuant to 28 U.S.C. § 144. All defendants previously moved for recusal by written motion of *June 12, 1973*, and orally on *July 9, 1973*. I denied the first motion by Order of June 12, 1973, and denied the second motion from the bench on July 9, 1973.

In their latest motion defendants correctly point out that 28 U.S.C. § 144 permits only one recusal motion in any single proceeding. I believe, however, that defendants' motion has a more fatal flaw. As I explained to the defense attorneys in my previous Order of June 12, 1973, 28 U.S.C. § 144 is not applicable in the Virgin Islands. Callwood v. Callwood, 127 F.Supp. 179 (D.C.V.I. 1954). Therefore, the defendants' motion must be DENIED. Moreover, even if the defendants had moved under the applicable local statute, 4 V.I.C. § 284, the motion would properly be denied for three reasons. First, I believe that the policy embodied in § 144 against harassing trial judges with multiple recusal motions is a sound one and should

be read into § 284. Secondly, I believe that the reasons I gave for denial of the previous motion to recuse in my Order of June 12, 1973, are of undiminished persuasiveness. Third, the only additional reason for recusal advanced by the defendants in their latest motion has no merit. Defendants allege that a letter, which appeared in The St. Croix Avis from Judge Charles D. Harris to myself shows bias on my part. I emphatically here state that the publication of this letter took place without my consent or knowledge, and that its contents in no way reflect any opinions which I may have as to the defense attorneys or defendants.

In the second place, there may be some question as to this Court's jurisdiction to decide this motion, since the defense attorneys gave oral notice of appeal before moving for a new trial. While there is some authority to the contrary, I believe this Court has jurisdiction under Rule 33 to entertain and *deny* a motion for a new trial based upon newly discovered evidence without the necessity of a remand. United States v. Frame, 454 F.2d 1136, 1138 (9th Cir. 1972); Richardson v. United States, 360 F.2d 366, 368 (5th Cir. 1966); Rakes v. United States, 163 F.2d 771, 772 (4th Cir. 1947). It is only after a trial judge has heard a motion for a new trial and decided to grant it that he must seek remand. In effect, then, a post-appeal motion for a new trial is deemed to be a motion to seek remand from the appellate court. The purpose of this fiction is to expedite proceedings and avoid the delay of an unnecessary request for remand. See Rakes v. United States, supra at 772. Since I have decided that defendants' motion must be denied, my jurisdiction is therefore clear despite the pending appeal.

A third preliminary matter is the somewhat novel procedure used in this case in obtaining a "prompt" evidentiary hearing. A more conventional evidentiary hear-

175

ing could not have been promptly held. Chief Judge Christian was, at the time, impaneling a jury for the Brauhaus murder case involving seven defendants. I had already left St. Croix on personal business and could not return promptly. The appointment of a Master to conduct the post-verdict questioning of the jurors was the only available solution. A prompt hearing (as defense counsel requested) was essential under the circumstances. The procedure devised and used by Chief Judge Christian was not inappropriate nor illegal and it preserved all of the defendants' rights. The motion for a new trial alleged many outside coercive influences against jurors. It was essential that an immediate evidentiary hearing into these allegations be had before any further possible coercion or intimidation of the jurors could occur. As I was absent from the district and unable to preside at this hearing, Chief Judge Christian properly assumed my duties under Rule 25(b):

"[i]f by reason of absence . . . the judge before whom the defendant has been tried is unable to perform the duties to be performed by the Court after verdict or finding of guilt, any other judge regularly sitting in or assigned to the Court may perform those duties."

Because Chief Judge Christian, the only other District Court judge in the Virgin Islands, was engaged in a very important ongoing trial, he chose to appoint Judge Marsh to conduct the hearings. I believe that this appointment, while without direct precedent, was entirely proper under Rule 57(b):

"If no procedure is specifically prescribed by rule, the Court may proceed in any lawful manner not inconsistent with these rules or with any applicable statute."

I am unaware of any inconsistent rule or statute.

Judge Marsh conducted a comprehensive hearing into all the allegations, carefully preserving the defendants'

176

right to cross-examination. See Remmer v. United States, 347 U.S. 227, 230 (1954); United States v. Guthrie, 387 F.2d 569 (4th Cir. 1967). He has assessed the demeanor of the witnesses and made findings of fact. It would, I think, be mere surplusage for me to repeat this hearing. I do believe, however, that the defendants are entitled to a review of the findings of fact, and to conclusions of law, by the trial judge himself, who was closest to the case and best equipped to assess the fairness of the proceedings. Therefore, I have given the transcripts of the hearings and Judge Marsh's findings of fact and recommendation the most careful scrutiny.

## II. GENERAL OBSERVATIONS

Before dealing in detail with the issues of jury misconduct raised by this case, it will be useful to begin with an overview of the legal problems the case presents. One must recognize, first of all, that the jury trial in the Virgin Islands is a unique institution. We are a small island and a closely interrelated community. In addition, we are a community which in recent years has been troubled by growing social pressures. It is not possible in such a community, with regard to any major case, to select a completely uninvolved and dispassionate jury, nor is it realistic to believe that jurors can deliberate with no thought of the problems that may face them on their return to the community. The transcript of the post-conviction examination before the Master of the jurors in this case, given the broad parameters of his inquiry, presents a provocative study of the efficacy of the jury system as it is presently constituted.

Secondly, I think it is important to realize that the mere fact that the integrity of the jury deliberations was in some way breached does not by itself necessitate a new trial. The sheer number of cases in which jury misconduct has been alleged shows how frequent and unavoidable are

the imperfections in the jury system. See Wright, Federal Practice & Procedure, § 554. The great majority of cases reflect a strong presumption against looking too scrupulously into the ways in which juries work. E.g., Richardson v. United States, 376 F.2d 844 (5th Cir. 1967); Ryan v. United States, 191 F.2d 779 (D.C. Cir. 1951), cert. denied, 342 U.S. 928; Fook v. United States, 164 F.2d 716 (D.C. Cir. 1947), cert. denied, 333 U.S. 838; United States v. Gibas, 300 F.2d 836 (7th Cir. 1962), cert. denied, 371 U.S. 817; United States v. Brown, 13 Alaska 392, 99 F.Supp. 527 (D.C. Alaska 1951, aff'd 14 Alaska 167, 201 F.2d 767 (9th Cir. 1953); Jackson v. United States, 313 F.2d 572 (D.C. Cir. 1962); United States v. Blackburn, 446 F.2d 1089, 1091 (5th Cir. 1971); Klimes v. United States, 263 F.2d 273 (D.C. Cir. 1959); Dickinson v. United States, 421 F.2d 630 (5th Cir. 1970); Medina v. United States, 254 F.2d 228 (9th Cir. 1958); Brumbaugh v. United States, 471 F.2d 1128 (6th Cir. 1973); Young v. United States, 163 F.2d 187 (10th Cir. 1947), cert. denied, 332 U.S. 846, 334 U.S. 859. This presumption can be most clearly seen in the rule that a juror may not be heard to impeach his own verdict.[1] The recent Report on Post-Trial Interrogation of Jurors (1972) prepared by a subcommittee of the Judicial Conference of the United States explained this rule as follows:

It is important to note that there are two general principles around which revolves the problem of challenging the validity of a verdict by attempting through juror interviews to find a sufficient imperfection therein. First, there is the right of a party to a lawsuit to have his case decided by a jury only upon the evidence presented in Court. Second, there is the need to protect the integrity of the jury system. When the two principles conflict, a balance must be struck.

---

[1] Another facet of this presumption is the wide discretion permitted trial judges in granting or denying motions for new trials. E.g., United States v. Sorvey, 151 F.2d 899, 903 (7th Cir. 1945), cert. denied, 327 U.S. 794; Wheaton v. United States, 133 F.2d 522 (8th Cir. 1943).

The policy considerations underlying the latter principle, i.e., freedom of deliberation, finality in the verdict and avoidance of jury tampering, have generally led the courts to resolve any conflict that arises in favor of the second principle, at least to the extent that the party attempting to overcome an adverse verdict is relying on a juror's affidavit or testimony reflecting information concerning his motives or beliefs. That a juror's expressions, arguments, motives and beliefs during deliberations may not subsequently be used to overturn the verdict is apparently based on the parole evidence rule, which makes the motives and beliefs that led to it irrelevant once the verdict is returned. The mental processes of each juror are personal to him and cannot be subjected to the test of other testimony. Hence, evidence regarding a juror's mental processes is never considered admissible. Appendix B at 4–5 (footnotes omitted).

Indeed, Judge Friendly has noted that "the 13th century jury was selected not because of its ignorance but because of its knowledge." The touchstone, according to Friendly, is "not the mere fact of the infiltration of some molecules of extra-record matter . . . but the nature of what has been infiltrated and the probability of prejudice." United States ex rel. Owen v. McMann, 435 F.2d 813, 816 (2d Cir. 1970). Too much cannot be expected of a jury. To paraphrase one of defense attorney Kunstler's colorful expressions, the kind of high dialogue one might hear at the United Nations will not occur on the bus.

■ Turning to the facts of the present case, there are two general circumstances which strongly indicate to me that the verdict returned was a reasoned and voluntary one. First, there is the fact that the jurors were individually polled at the end of their deliberations pursuant to Rule 31(d) of the Federal Rules of Criminal Procedure. The object of a jury poll is "to give each juror an opportunity, before the verdict is recorded, to declare in open court his assent to the verdict which the foreman has returned and thus to enable the court and the parties to as-

certain with certainty that a unanimous verdict has in fact been reached and that no juror has been coerced or induced to agree to a verdict to which he has not fully assented." U.S. v. Grosso, 358 F.2d 154, 160 (3d Cir. 1966). Accord Posey v. United States, 416 F.2d 545, 554 (5th Cir. 1969) cert. denied, sub nom. Snowden v. United States, 397 U.S. 946; Miranda v. United States, 255 F.2d 9, 16 (1st Cir. 1958).

█ The conclusiveness of the jury poll on the voluntariness of a jury's verdict is especially great in the Virgin Islands, since here the requirement that a jury's verdict be unanimous arises not from the Constitution but merely from Rule 31(a) of the Federal Rules of Criminal Procedure.[2] The sole sanction to assure voluntariness under this

[2] It is clear that the defendants' rights to a unanimous jury verdict do not rise to constitutional proportions. In Government v. Bodle, 427 F.2d 532, 7 V.I. 507 (3d Cir. 1970), the Third Circuit stated that "[t]he Sixth Amendment guarantee of a trial by a jury in all criminal prosecutions is deemed a remedial right which is not among the fundamental rights which Congress in legislation for an unincorporated territory such as the Virgin Islands must secure to its inhabitants." 7 V.I. at 509 n. 1. Accord Rivera v. Government of the Virgin Islands, 6 V.I. 155, 375 F.2d 988 (3d Cir. 1967). Of course, the Third Circuit noted that Congress has chosen to enact purely statutory guarantees "similar to those of the Sixth Amendment." Indeed, a 1968 amendment to the Organic Act of 1954, § 3, specifically refers to the Sixth Amendment as applying as a statutory enactment in the Virgin Islands. But even this statute, in my view, is not the basis of a unanimity requirement in the Virgin Islands. Section 3 states, somewhat ambiguously, that the constitutional provisions it incorporates "shall have the same force and effect [in the Virgin Islands] as in the United States or in any State of the United States." I believe that this language must mean that in a case which is a local, "state" prosecution, such as this one, the incorporated provisions must apply as the Supreme Court has applied them to the states through the 14th Amendment. And, of course, in Apodaca v. Oregon, 406 U.S. 404 (1972), the Supreme Court has held that the 6th Amendment imposes through the 14th no unanimity requirement on a state. Therefore, I must look farther still for the basis of a unanimity requirement. This basis is not to be found elsewhere in the Organic Act or in the local statutes. See Revised Organic Act of 1954, § 26; 5 V.I.C. ch. 309. Rather, the only basis for unanimity is a mere flexible procedural rule, F. R. Crim. P. 31(a), with not even the power behind it of a substantive enactment of Congress. 18 U.S.C. § 3771. Therefore, the right of these Virgin Islands defendants to a unanimous jury verdict (as distinguished from a *fair* verdict), although not abrogated as it has been in many states, is weak indeed compared to the rights of defendants tried in mainland federal courts. Such a technical procedural right, it would seem, could hardly be hedged about with those protections a constitutional right would entail.

Rule appears to be the jury poll provided by 34(d). See p. 23, n. 6, infra.

■ Indeed, there is every reason to believe that such a sanction is by itself generally sufficient to assure a voluntary verdict. In the present case, for example, each juror had an opportunity to renounce his decision as the product of coercion or outside influence, yet none chose to do so. The transcript of the jury poll, which was taken sua sponte by the Court, makes it clear that each juror knew he or she could renounce the earlier verdict:

"THE COURT: I would like to advise counsel that I have inspected all of the five verdicts and concur with the reading made by the Clerk of the Court and I wish also to add that all five verdicts have been signed by all twelve of the jurors.

"I would like to explain for the jurors that the statutes of the Virgin Islands provide that the Court or any attorney on either side may ask to have the jury polled. That is just a procedure by which the Clerk will ask each one of the jurors if these are his or her verdicts. Since there are five verdicts we will try to shorten this process by having each juror answer if these five verdicts are his or her verdict. And it will be asked individually."

I find it particularly significant that the jurors were asked what "is" your verdict, and not what "was" your verdict. Also, since the jury poll took place approximately 18 hours after the end of deliberations, there was ample time for each juror to rethink his verdict and to expunge from his decision any effects of outside influence before his final opportunity to change his mind—the jury poll.

■ Furthermore, not to give the jury poll conclusive effect is fraught with danger. Because the poll of the jury occurs at the end of deliberations before the jurors have been subjected to criticism or popular disapproval of their verdict, it is the most desirable time at which to assure that their decision was freely and voluntarily made. (It should be noted that the jury was sequestered up until the time of

181

the jury poll and therefore that the poll was untainted by community pressure.) The interest in finality of verdicts supports the conclusion that subsequent fishing expeditions into the voluntariness and unanimity of the verdict should be barred. But even more important is the likelihood that a contrary rule would encourage intimidation and coercion of jurors after the verdict in order to convince them to renounce their decision. The unanimous verdict and jury poll in this case assured that for legal purposes the decision was voluntarily reached. To permit impeachment of the verdict now by jurors who may have been threatened and coerced into alleging that their decision was based upon outside pressures would disregard the most effective means of assuring voluntariness: to wit, the jury poll.

This brings me to the second circumstance which leads me to believe that the verdicts in this case were voluntary. It is starkly clear from the testimony of the jurors that upon discharge they were subjected to immediate and ruthless coercion and pressure by certain elements of the community. See pp. 17–22, infra. This campaign of fear began from the instant the jurors left the courtroom and has continued unabated to the present. Certain persons solicited jurors for affidavits impeaching their verdicts, and several jurors were won over, by persuasion or fear, see pp. 13–14, infra. Needless to say such conduct necessarily borders on obstruction of justice and is universally condemned. See Rakes v. United States, 169 F.2d 739, 745–46 (4th Cir. 1948), cert. denied, 335 U.S. 826; United States v. Miller, 284 F.Supp. 220 (D. Conn. 1968); United States v. Driscoll, 276 F.Supp. 333 (D.C.N.Y. 1967); United States v. Provenzano, 240 F.Supp. 393, 411–413 (D.N.J. 1965), aff'd, 353 F.2d 1011 (3d Cir. 1965), cert. denied, 384 U.S. 905; United States v. Nystrom, 116 F.Supp. 771, 777 (D. Pa. 1953), aff'd, 237 F.2d 218 (3d Cir. 1956). To permit such

tactics to undermine a verdict certified as voluntary by a jury poll would jeopardize the integrity of the jury trial. What is more, the statements of any juror who seeks to impeach his verdict after solicitations and pressures to do so must be subject to severe suspicion.

### III. EVALUATION OF THE FAIRNESS OF THE JURY DELIBERATIONS

Before I review Judge Marsh's findings of fact and make conclusions of law thereon, I must consider a separate matter raised in defendants' motion for a new trial. This matter is the defendants' contention, previously made by motion three times during the jury deliberations, that the length of those deliberations were coercive and oppressive. I denied all three of these motions during the trial with written Orders. I believe that the reasons I gave in these Orders remain sound and I incorporate them here. See Appendix.█

█ Defendants do raise several arguments not made in their earlier motions. First, they point to the fact that, since their last motion (of August 10th) for a mistrial during the jury deliberations, an additional 5 1/2 hours of deliberation occurred on August 11th and 12th. Total time of deliberation was therefore 45 hours. See Orders of August 8th, 10th and 11th (pp. 9–15 of the Appendix). It is my judgment that the additional 5 1/2 hours of deliberation can make no difference in my earlier decisions that the length of deliberations was not oppressive or unreasonable. My Orders of August 8th, 10th and 11th discuss my reasons for this conclusion in full.

█ Secondly, defendants point to an additional note received from the jury at 10:05 a.m. on Saturday morning

of August 11th. This note was signed by all twelve jurors and read:

"Dear Judge Young;

We have been arguing for many days now and still have not been able to reach a unanimous decision.

What happens next?

The Jury"

Defendants claim that this note indicated that a deadlock had occurred and that a mistrial was mandatory. I cannot agree. Even if the note had indicated that a deadlock had been reached, it was within my discretion to extend deliberations. United States v. Cagle, 448 F.2d 644 (5th Cir. 1971) cert. denied, 405 U.S. 976; DeVault v. United States, 338 F.2d 179, 182 (10th Cir. 1964); United States v. Minieri, 303 F.2d 550, 556 (2d Cir. 1962) cert. denied, 371 U.S. 847.

But I do not even believe that the note necessarily indicated an impasse. Rather it seems to say that the jury is still "arguing" and the phrase "what happens next?" seems to ask for instructions as to further deliberations. Taking this view of the note, I decided to call the jury back in for further instructions. At this time, after a full discussion with counsel as to the appropriate wording, I repeated my earlier instruction on methods of deliberation and asked the jury to deliberate for one or two more days. I emphasized to the jurors at this time that the continuation of deliberations was in no way intended to force agreement and that they could continue to disagree. Since these instructions strongly indicate the voluntariness of the subsequent verdict, I will quote them here:

"(The following proceedings continued in Court with the jury, all defendants and counsel present.) [Time: about 11 a.m., Saturday morning, August 11, 1973.]

184

"THE COURT: Good morning, ladies and gentlemen of the Jury:

"I have received your note, which you have all signed, and I have given it quite some consideration. I would like you to know that it is within the Court's discretion, and it has been my practice, anyway, that upon receipt of the first indication that the jury is having difficulty in arriving at agreement, to call them in and ask that they continue to deliberate a little longer. I am going to do that in this case.

"In asking you to continue to deliberate a little longer, please do not construe that to mean that I am asking you or forcing you to return a verdict as to any one or more, or all, of the defendants. You may continue to disagree; you may never reach agreement. The Court does not force you to agree merely to return one or more verdicts, as in this case. I am merely asking you to go back to your deliberation room to discuss all the issues in good faith and be reasonable, discuss all the aspects of the case with your fellow jurors, as you have in the past.

"Today is Saturday, I will ask that you continue to deliberate today. Tomorrow is Sunday; there will be church services available to those who wish to go to church at the hotel, and I will leave it up to you if you want to deliberate tomorrow afternoon. If you agree unanimously to spend a few hours tomorrow afternoon, you may do so.

"If you have not agreed by that time, I am going to have you brought down here [the jury deliberation room] on Monday. If you have not reached any agreement by Monday afternoon, I will call you back to the jury box. I will first confer with the attorneys and we can renew and re-examine the decision that I have made today about continuing to deliberate.

"This is all that I can say at this time.

"If you have a note for me, if you deliberate Sunday afternoon, I will have the bus take you down here [the jury deliberation room] and I will come in to my office. The marshals will advise me so that I will be handy in case you have any note to give to me, I will be in touch with all of the attorneys too, so we can discuss any questions that might arise. And on Monday, all attorneys will be available here during all the day, or will be on call, anyway, so they can be reached at any time.

185

"I want to thank you for your continued efforts and your efforts so far and I do want you to deliberate a little longer.

"You may dismiss the jury.

"(At this time the Court was adjourned for the day.)"

 Third, defendants advance the affidavit of juror Lionel L. Rodgers, which states as follows:

"To Chief Judge of the Virgin Islands:

"The Verdict delivered after nine (9) days of deliberation does not represent my honest judgment. My verdict was not voluntary. It was the end product of pressures applied by Judge Warren Young, who refused two verdicts and the majority of the jury who, to me seemed to have had predetermined verdicts.

"Sincerely,

"Lionel Rodgers /s/."

I give this affidavit absolutely no weight for the following reasons. First, it comes squarely within the rule that jurors cannot impeach their own verdicts as to their internal deliberations, discussed more fully below. Secondly, the affidavit is bogus in that at the time it was signed by Juror Rodgers, he did not understand it, nor does he understand it now. It is not written in Rodgers' handwriting, nor is it likely that he could have produced its flawless grammar with his sixth grade education. Indeed, Rodgers testified at the evidentiary hearing that the affidavit was dictated to him by sympathizers of the defendants and that he had no understanding of the allegations in it:

"Q [U.S. Attorney Brady] Let me ask you again. These words here, as they appear, did they come out of your mind? Did you sit down and compose this yourself, or did somebody suggest to you what you should write, or tell you?

"A [Rodgers] Well, he was talking and I was doing the writing.

"Q By 'he was doing the talking,' and you doing the writing, was he telling you what to write and were you writing the words he said?

"A Yes, sir.

186

"Q Or telling you?

"A Writing the words he said.

"Q He was saying words and you were writing them?

"A Yes.

"Q Are they the same words that appear here?

"A I don't know. It was a white paper, but I don't remember seeing these lines.

"Q That is your writing, Mr. Rodgers?

"MR. MERCER: Is that the original?

"THE WITNESS: I don't know. But it seems to be funny, like the letter I write was stamped by some kind of a thing.

"Q I understand that. But looking at this, does this appear to be your writing?

"A No. (T. 108–109)

\* \* \*

"Q Do you still stand behind that affidavit? Is that still your honest statement? You will stand behind it?

"A Well, I don't know, like really what it was. Like I say, why, because I was told that they going to be something for some Civil Rights or something like that. So, I don't know what Civil Rights is about." (T. 100.)

It is clear from Rodgers' testimony that his affidavit was the product of both fear and confusion, and that there is no truth in it.

I will now proceed to review Judge Marsh's findings of fact. His findings and report reveal a careful consideration of all the allegations contained in the two affidavits and the defendants' motion for a new trial. The findings of fact are prefaced with a copious review of the testimony given before him at the special hearing. Because Judge Marsh has provided this elaborate exegesis of the testimony with many references to the full transcript, I have chosen not to make direct reference to the examination questions and answers of the jurors pertaining to the charges of outside influence. I feel that this procedure contained herein will avoid unnecessary repetition and, more importantly, will

187

preserve the confidentiality of the innocent juror's testimony. Consequently, I have, except where I found it necessary to refer to the testimony pertaining to those jurors who have attempted to renounce their verdicts, decided merely to summarize Judge Marsh's ultimate findings of fact on the issues critical to this inquiry. At this point it might be well to mention that the examination of the jurors was to be "in camera" according to the Order of this Court referring the post-trial interrogation of the jurors to a Special Master. Since the Master's Report contains quotations from the restricted transcript, I must classify the Report as restricted, except for the Findings of Fact and Recommendation.

After the Master's consideration of all the testimony, and resolution of several conflicts therein, he made the following findings of fact:

1. That the affidavits of Messrs. Allick and Rodgers containing allegations of outside influence and pressures on the jury "are without foundation of fact, are false and untrue." P. 24.

2. That the most serious suggestion of outside influence affecting the verdict—Juror Allick's fear of prosecution for perjury—was internally generated. It "came to Mr. Allick from other jurors and was not brought to his attention from any outside source." P. 22. Moreover, Mr. Allick's testimony that this rumor had any effect on his decision to return a verdict of guilty was found incredible.

3. That there is no indication in the testimony whatsoever that the false rumors regarding investigations of juror's families by the FBI "were generated outside the jury confines and brought into the jury room from any outside source. It must therefore be concluded that the rumors were not the product of outside contacts with the jury." P. 20.

188

4. That information about other homicides committed while the jury was deliberating may have reached some of the jurors. However, "it was not discussed in deliberations, was not considered and did not affect the verdict." P. 22.

5. That the testimony that one of the attendant Marshals said to juror Allick, "Do you know how much this [is] costing the Government" and "Let's get this over with Allick" is not credible. Two communications with the jurors by jury attendants probably did take place but they were "completely harmless" and "could not, in any way, have tended to influence Mr. Allick's ultimate decision." P. 23–24.

6. That "no extraneous matter was brought to the attention of the jury in the course of its deliberations" and "no outside pressures were brought to bear upon any juror tending to influence his verdict during the course of the jury's deliberations." P. 24.

 In reviewing Judge Marsh's findings, the initial question to be decided is the proper standard for my review. I have concluded that the findings must be accepted unless they are clearly erroneous. Although the Federal Rules of Criminal Procedure do not specify the scope of review of findings of fact made by a Judge appointed under the circumstances present here, I believe the clearly erroneous test should apply for three reasons. First, this is the standard applicable for review in the analogous case of a Master's findings of fact in civil cases without a jury. Federal Rule of Civil Procedure 53(e)(2); Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 689 (1946). Secondly, because the Federal Rules of Criminal Procedure specify no standard of review, it has been held under Rule 57(b) that on review of fact findings unrelated to the exercise of trial court discretion, the clearly erroneous standard applies. Jackson v. United States, 353 F.2d 862, 864–5 (D.C. Cir. 1965). Finally, a broader scope of review would be in-

appropriate in that only the Master had the opportunity to hear the testimony under direct and cross-examination of the jurors and to assess their credibility. Defendants have a right to such an assessment. See Remmer v. United States, 347 U.S. 227, 230 (1954); United States v. Guthrie, 387 F.2d 569 (4th Cir. 1967).

 From a careful review of the transcript, there are several general circumstances which persuade me that the Master's findings are sound and not clearly erroneous. To begin with, a substantial preponderance of the testimony indicated that there was no undue outside influence. Eight of the jurors (T. 150, 156, 164, 171, 180, 186, 233, 252) testified that there was no outside pressure on the jury to their knowledge. The jury Marshal and jury Matron both denied that any leaks to the jury had occurred. None of these witnesses was impeached in any way.

I find it interesting, by contrast, to observe how vague, confused, and contradictory are the stories of the four jurors who indicated that there was some outside pressure. This vagueness becomes especially great when they are asked to identify the sources of the alleged outside influences. I believe that it is especially significant that the only three persons who were actually pinpointed as sources of outside influence (one of the jury Marshals, one of the two jury Matrons, and one of the jurors) all denied, without hesitation, the allegations. (T. 254 et seq., 297–308).

Why the impeaching jurors, or those who told them what to say, chose these three for their allegations seems obvious. The juror alleged to be the source of outside influence required special medical assistance during the deliberations and thus spent a brief period apart from the rest of the jurors. This circumstance would lend a superficial plausibility to assertions of wrongful contact between Marshals, Matrons, and such a juror.

I am convinced that the Master was correct in disbe-

lieving these allegations. A motive why the impeaching jurors would make such allegations clearly appears in the record. Bluntly put, this motive was fear.

The case of juror Allick is an excellent example. There are many indications in the record that Allick was afraid of the consequences of a guilty verdict. One of the jurors testified as follows, for example:

"Q [The Master] Did Mr. Allick ever say anything to you in the course of your discussions with him? Did he ever say that he was frightened of what might happen?

"A [One of the jurors] Yes, he did.

"Q When was that?

"A That was at the beginning, I would say about the third day ...." (T. 259.)

Another of many examples I could give is one of the juror's description of Allick's demeanor and statement when he signed the verdict:

"And [Allick] said, we must all sign. And we all signed the paper [the verdict] and give it to the Marshal and the Marshal give it to the Judge. And when [Allick] finish signing for all five defendants, he stood up like this and he said, 'I cannot go back to college,' and nobody ask him why he can't go back to college. I didn't ask him and nobody ask him anything." (T. 173.)

Allick himself indicated that he was afraid:

"Q [By U.S. Attorney Brady] Let me ask you another thing, unrelated. You mentioned before that you had planned to go away. Remember?

"A [Allick] Yes.

"Q When did you make that plan to go away?

"A With Mr. Stuckile.

"Q And when was that?

"A Monday, after the deliberations ... after the verdict.

"Q After the verdict. Did you make any plan to go away before the verdict?

"A No. ..." (T. 148.)

191

The jury's fear is perhaps most clearly seen in a message from Allick and another juror to myself immediately after the end of jury deliberations:

"Dear Judge Young:
Some of us would like to know what kind of protection will be provided for all of us.
With this we mean Personal Protection.

[Signed—One of the Jurors]
Foreman Myron Allick"[3]

Immediately after the release of the jury, certain members of our community began to play on these fears. Shortly after Allick arrived home, the coercion or persuasion began with the arrival of Senator Malloy (Allick's ex-brother-in-law) at Allick's house. Apparently nineteen-year-old Allick was easily persuaded to impeach his verdict. For soon both Malloy and Allick embarked on a peculiar journey to stir up other possibly fearful jurors. Malloy testified:

"Anyway, we went for a ride. The first person we went to, I don't recall the name, but she is a juror and she lives in. . . . I stayed in my car and he [Allick] went and he spoke with her. And they spoke for approximately fifteen minutes. . . .

"When he came back, he said that she would, she didn't want to, I don't recall exactly how. He said something to the effect that if she was called, but she was not enthusiastic about opening up the case. . . .

"After we left, we went to [another juror's] house . . . [etc.]" (T. 208–09.)

---

[3] It is interesting to note that Allick no longer sought protection *after* he had sworn out his impeaching affidavit. That a change in Allick occurred only after he re-entered the community also clearly appears from the circumstances of the jury, as discussed above. I will quote from the transcript of the poll:
"THE CLERK: Mr. Allick, is this your verdict as to the defendants Meral Smith, Rafael Joseph, Ishmael La Beet, Warren Ballentine and Beaumont Gereau?
"MR. ALLICK: Yes, that is my finding.
"THE CLERK: He answered, 'Yes.' "

Later the same day Allick's affidavit was solicited by one Johnny Ross and one Mario Moorhead (T. 286–292). These were the same two gentlemen who appeared to have coerced or confused juror Rodgers into signing the affidavit which Rodgers did not understand, as has been discussed above. They were apparently informed by Mr. Malloy that Allick had been won over and they [Messrs. Ross and Moorhead] indicated that they had been in contact with some of the defense attorneys.[4] These two affidavit seekers put additional pressure on Allick. As Allick himself tells it:

"Q [The Master] Did you have any occasion to see Mr. Ross just before or just after this trial?

"A [Allick] After.

"Q After. How long after did you see him?

"A The night after.

"Q What?

"A The night after.

"Q Would that be Monday night or Tuesday night?

"A It would be Tuesday night. . . .

"Q Where did you see Mr. Ross that night?

"A He came by my house.

"Q What time was that when he came by?

"A Say about eight o'clock.

"Q And did he come in your house?

"A Yes.

"Q How long did he stay?

"A About 15 minutes.

"Q What did he have to say when he got there?

"A Senator Malloy had talked to some people about it, about what I had told him, so he came to ask me about it too.[5]

"Q What did he ask you?

"A What did he ask me?

"Q Yes.

"A About what I told Senator Malloy.

---

[4] If this in fact occurred, then these attorneys, and those who acted for them, may well have violated my Order of August 10th regulating post-trial interrogation of jurors.

[5] It should also be noted that Senator Malloy did not admit this in his testimony.

"Q And what did you tell him?

"A I told him it was true, yes, I knew Mercer, yes; and he was telling me that people, you know, was hating me and all that, and he said that it was right for me to get it off by telling it to the public. But I want to keep my name cool for awhile.

"Q What did he want you to do?

"A He didn't want me to do anything, he just asked me if I would, you know, be willing.

"Q To do what?

"A To talk about it.

"Q When he said that people hated you, who did he mean?

"A Not hated, but, you know, people didn't like the idea I was acting. That was after I talked to Malloy about it.

"Q Well, now, which thing are we talking about, what you did, I mean about your verdict, that they didn't like you for this, or that they didn't like you for what you said to Mr. Malloy?

"A No, it was what I said to Mr. Malloy about what happened in the deliberation room. So he want me to make it public at that time. But I told him that I was going to give it official, stay with the Government and I talk to a lawyer instead of going out and put it in a newspaper right away.

"Q He wanted you to put it in a newspaper right away about what you told Senator Malloy, is that it?

"A Sort of, yes, kind of, yes.

"Q Did he talk to you about making an affidavit?

"A Yes.

"Q What did he want you to say in the affidavit?

"A No, he was telling me about some lines, you know, if this was true what I told Malloy, and he had some lines to start something to have a mistrial about the jury, about jury tampering. So he asked me, you know, say something, say I was forced and all that. . . .

"Q [By U.S. Attorney Brady] You said Johnny Ross said something to the effect that there were some lawyers that wanted you to do something. Did he tell you who those lawyers were?

"A Mr. Mitchell, Mr. Kunstler ... I don't know all.

"Q Did he use the names of all the lawyers or some of the lawyers who were involved in the defense of the defendants?

"A Yes.

"Q And this was on Tuesday?

"A Tuesday night.

194

"Q Tuesday night. Did Mr. Ross, Johnny Ross, help you with the affidavits? Did he assist you in making it or did he do anything in regard to the affidavit?

"A No, he just asked me if I would be willing, and I said yes, because I wanted to get it out from my conscience.

"Q Did you make the affidavit yourself?

"A Yes.

"Q Where did you do that and when?

"A Where?

"Q Where did you do it and when?

"A I did that Wednesday afternoon, I think it was.

"Q Where?

"A In Mr. Padilla's office, and Mr. Padilla signed it.

"Q Did you write it out, yourself, in Mr. Padilla's office?

"A No.

"Q Where did you write it out?

"A I went down to Mario Moorhead's store and write it out.

"Q Which Mr. Moorhead are you talking about?

"A Mario.

"Q Mario in Frederiksted?

"A Yes.

"Q And was Johnny Ross there at the time you prepared this affidavit?

"A Right.

"Q Now, I ask you again, did he help you in any way in preparing this affidavit?

"A No, he didn't.

"Q But he was there?

"A Yes.

"Q And Mr. Moorhead was there?

"A He just ask me if I would be willing to write out something to start, you know. So I just wrote it out.

"Q But you did discuss the contents of the affidavit with them before you wrote it?

"A No.

"Q You didn't have any discussion with them at all?

"A No, I just wrote it out."

To summarize, I believe there was ample evidence of fear and coercion as to the impeaching jurors to warrant the Master's findings that they were incredible.

Judge Marsh did find that certain outside contacts *might* have occurred. However, he also found that these contacts, if they did occur, could not be characterized as improper outside influences, and moreover were harmless and without prejudice to the defendants. Some doubt may arise as to the legal standard which the Master used in reaching his factual findings of harmlessness, and indeed there is much doubt in the case law as to the legal standard properly applicable. I have given the most searching attention to the transcript of the hearing. I believe that in light of the transcript Judge Marsh's findings of non-prejudice clearly satisfy even the highest possible legal standard, that of Remmer v. United States, 347 U.S. 227 (1954).[6] Remmer

---

[6] I think it would be useful if I expressed my views on the applicability of Remmer to this case. Because the Government has fully satisfied the Remmer requirements, I need not decide whether the very strict standards of Remmer properly governed here. However, it is my firm belief that a less onerous test is desirable, and that the applicability of Remmer here is at best doubtful.

I say this for two reasons. First, I do not believe that Remmer has withstood the test of time. In the years since Remmer, the traditional restraints which the use of juries imposed on criminal trials have been loosened substantially. Thus, in the companion cases, Apodeca v. Oregon, 406 U.S. 404 (1972) and Johnson v. Louisiana, 406 U.S. 356 (1972), the Supreme Court held that neither due process nor the Sixth Amendment require a unanimous jury verdict in a state prosecution. Commentators have pointed out that the strong policies against costly retrials and hung juries expressed in these decisions, e.g., 406 U.S. at 303, were inherently inconsistent with the Court's earlier jury misconduct cases. See 86 Harv. L. Rev. 153 (1972). Likewise, in Williams v. Florida, 399 U.S. 78 (1970), the Court dispensed with notions of the sanctity of traditional jury processes by permitting a 6-man jury. Significantly, the Williams Court emphasized that the purpose of a jury trial was to protect defendants against Government oppression and not against community feelings and pressures. 399 U.S. at 100. This also seems inconsistent with Remmer's approach which focused on Government misconduct.

Then, too, the difficulties with the jury system in recent years have highlighted the traditional reasons for not looking too closely into jury deliberations. These traditional policies were overlooked in Remmer. Chief among them is a very strong policy of finality of verdicts and of terminating litigation. Moreover, discouraging jury misconduct investigations avoids undue harassment of jurors. Such harassment is ever more undesirable in these days when citizens are already so reluctant to serve on jury panels, and thus reluctance is especially severe in the Virgin Islands. Since most jury misconduct claims are without merit, investigating them is, in general, a useless waste of precious judicial resources. And finally, such investigations merely encourage defense attorneys to stir up more worthless claims of misconduct. See U.S. v. Crosby, 294 F.2d 928, 949 (2d Cir. 1961). I believe that Remmer must be reevaluated in view of these

196

imposed on the Government the "heavy burden" of showing that outside influences were not prejudicial to a defendant. There can be no doubt from my review of the record that Judge Marsh was correct in finding as a fact that the Government carried this burden. Certainly, at least, I cannot say that the finding was "clearly erroneous."

The only possible outside contact of any seriousness was information concerning the several murders which occurred on St. Croix while the jury was deliberating.[7] Judge Marsh found that this information *might* have reached the jurors, or some of them, but that they did not discuss it, and the information had no effect on the outcome.

<hr>

policies, and in view of the Supreme Court's recent change of attitude toward the jury system.

Secondly, it is my opinion that Remmer does not even reach the Virgin Islands, and has never had any applicability here. Remmer and kindred cases provide stiff sanctions against violations of the constitutional right to a unanimous verdict. But as I have pointed out earlier, this constitutional right does not extend to this jurisdiction. See p. 7 n. 2 supra. Rather the necessity of unanimity in this trial stemmed merely from F. R. Crim.P. 31(a), a procedural rule without even the force of a substantive act of Congress, see U.S. v. Bink, 74 F.Supp. 603, 615 (D.Ore. 1947), not to mention a provision of the Constitution. It stands to reason that the remedy for violations of Rule 31(a) should be less severe than the remedy for violations of the Sixth Amendment. Indeed, I believe the only proper remedy for 31(a) is the jury poll provision in 31(d).

Furthermore, I believe that the Supreme Court has traced a more proper remedy in certain jury misconduct cases where the key was not preservation of unanimity but rather whether the overall fairness of the proceedings satisfied due process. In Estes v. Texas, 381 U.S. 532 (1965) (televising of trial), the Court formulated a test for fairness in terms of the "probability of prejudice" under all the circumstances. Accord, Jenkins v. United States, 380 U.S. 445 (1965) (Judge's charge); Sheppard v. Maxwell, 384 U.S. 333 (1965) (publicity and disruptions). Justice Harlan has elaborated on the Estes test as follows:

a substantial showing of prejudice must be made [by a defendant] before a due process violation can be found.

Parker v. Gladden, 384 U.S. 363, 368 (1966) (Harlan, J., dissenting).

I believe Justice Harlan's view that the burden of showing prejudice rests on the defense would be proper in this case—for all the reasons elaborated above. From my careful review of the record it is clear to me that the defendants have not carried this burden. I might even point out that in Johnson v. Louisiana the Supreme Court found that conviction by a 9-3 verdict still gave a defendant a fair trial and established his guilt beyond a reasonable doubt. If the Johnson standard of due process applied, then it would seem ineluctable that the issue of fairness was foreclosed when on the first poll of the jury the vote stood 9-3 for conviction (T. 11).

[7] Judge Marsh has clearly demonstrated in his Report that all possible contacts between the Marshals and matrons, and the jury were in the line of duty and patently harmless. I adopt his conclusion here.

197

I believe that this finding of harmlessness is solidly supported by the transcript. The Government conclusively showed that this information had no effect on the deliberations. First, it should be observed that by the time the murders occurred, all the jurors save one had been persuaded by the overwhelming weight of the evidence of guilt (T. 75, 125). Second, the one who was apparently still holding out for a verdict of not guilty, testified that the only effect of the news of the murders was to increase the fears of the jurors about the consequences of a guilty verdict:

"Q And did this [the murders] come up in the jury room? Was this discussed?

"A No. The thing that was discussed in the jury room that somebody was dead and suppose those fellows come to kill us. Anyway, we be dead."

Moreover, I question whether there is any duty on the part of those supervising the sequestration of the jurors to keep the jurors completely sterile and uninformed.

My discussion of law thus far has concerned the finding that there might have been some outside contacts with the jury. I will now elaborate on this discussion and make my conclusions of law. Even if outside contacts did occur, the conclusion that defendants are not entitled to a new trial because of such contacts is clearly required by the Master's finding (which I have adopted): That these contacts were harmless. Remmer v. United States, 347 U.S. 227 (1953).

A very different legal problem is posed by the great bulk of the testimony and allegations at issue here, which do not involve outside contacts at all. Instead, they represent a broad and unstructured attack on the verdict by a few dissident jurors. The basic legal principles which must govern my determination of the legal sufficiency of this attack were well summarized in Judge Marsh's Re-

198

port when he referred to the language of Proposed Federal Rule of Evidence 606(b):

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning any matter about which he would be precluded from testifying be received.

An examination of the transcript of the jurors' testimony demonstrates that evidence of many matters was heard in the evidentiary hearing which falls beyond the scope of testimony properly admissible upon an inquiry into the validity of a verdict. However, I think it is desirable that such a broad examination had taken place. As the Master pointed out, it is often necessary to allow a juror-witness to answer questions in narrative form, covering many extraneous matters, in order to insure that any genuine outside influences are discovered. Furthermore, it is my view that the strict rules relating to post-verdict inquiries should not be woodenly applied in all cases, particularly in a serious criminal case such as this where extremely important rights are at stake. See Cherensky v. George Washington-East Motor Lodge, 317 F.Supp. 1401, 1404 (E.D. Pa. 1970). Still, the ultimate force and effect of the rule must not be relaxed. Evidence of jurors no matter how seriously it impeaches their verdict, will not be sufficient to support a motion for a new trial if it reveals no improper outside influences.

The cases dealing with post-verdict inquiries make absolutely clear that the vast majority of testimony received

here provides no basis for granting a new trial. The rule, simply stated, is that "a juror cannot impeach his own verdict." McDonald v. Pless, 238 U.S. 264, 267 (1915); Webb v. United States Lines, 266 F.2d 611 (2d Cir. 1959); Bartholomew v. Universe Tankships, Inc., 263 F.2d 437, 448 (2d Cir. 1959); Cunningham v. United States, 356 F.2d 454 (5th Cir. 1966); Parsons v. United States, 188 F.2d 878 (5th Cir. 1951); Thedorf v. Lipsey, 237 F.2d 190, 194 (7th Cir. 1956). The sound policies on which this rule is based have been noted by many courts and bear repeating here. "This rule is a salutary one because it protects the secrecy of jury deliberation, supports the finality of verdicts and prevents possible post-verdict harassment of jurors." Cherensky v. George Washington-East Motor Lodge, 317 F.Supp. 1401, 1404 (E.D. Pa. 1970). The Supreme Court has long warned of the consequences of abandoning the rule:

> But let it once be established that verdicts solemnly made and publicly returned into Court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation; to the destruction of all frankness and freedom of discussion and conference. McDonald v. Pless, 238 U.S. 264 (1915); Domeracki v. Humble Oil & Refining Co., 443 F.2d 1245, 1248 (3d Cir. 1971).

Applying the rule, as I feel I must, I conclude that those portions of the testimony which attack the verdict as the product of something other than reasoned deliberation are merely impermissible attempts by several jurors to impeach their verdict.

██ I feel I should elaborate somewhat on this conclusion. At the very heart of the rule that a juror cannot impeach his own verdict is the judgment that certain matters essentially inhere in the verdict itself. Hyde v. United States, 225 U.S. 347, 384 (1912). The various arguments advanced by jurors during their deliberations and the effect these arguments might have had in persuading other jurors toward the verdict are therefore irrelevant in ruling upon a motion for a new trial. In a sense, the jury's deliberations merge into their final verdict and cannot be exhumed afterwards. See Bateman v. Donovan, 131 F.2d 759, 764–65 (9th Cir. 1943); Poindexter v. Groves, 197 F.2d 915, 918 (2d Cir. 1952); Davis v. United States, 47 F.2d 1071 (5th Cir. 1931); 8 Wigmore on Evidence § 2348, et seq. (3d ed. 1940). Much of the testimony contained in the transcript merely repeats the arguments of the jurors and relates the interactions which took place among jurors during the lengthy deliberations. It is of no significance for the purposes of this motion that many of the matters discussed concerned, not the merits of the case, but the juror's impressions of each other or conjecture as to what was taking place outside the jury room. While it is regrettable that a jury would occupy itself with such discussions, at times to the total exclusion of the important issues facing them during their deliberations, it does not follow that a new trial should, or could, be granted.[8] The sound policies underlying the rule prohibiting jurors from impeaching their own verdict convince me that I cannot even consider such evidence in ruling upon this motion.

Of somewhat greater concern to me is the evidence of pressures applied by some jurors on others, almost to the

---

[8] As Judge Marsh stated during the course of the hearing: "It doesn't make any difference if somebody prayed, it doesn't make any difference if somebody lost his temper. It doesn't even matter if some jurors threatened to hit another one. All of those things are completely immaterial to this inquiry." (T. 248.)

point of physical violence, in order to persuade them on certain issues. However, even assuming that in an extreme case evidence of such pressure might fall outside of the no impeachment rule, it is clear that the pressures revealed by the testimony do not rise to such an extraordinary level. Moreover, I firmly believe that post-verdict attacks based on affidavits alleging conduct bordering on the outrageous must still be resisted in the interest of preserving a workable jury system. See United States v. Grieco, 261 F.2d 414, cert. denied, 359 U.S. 907 (2d Cir. 1958). In this regard, I observe with approval the language of the Third Circuit in United States v. Kafes, 214 F.2d 887, 889 (3d Cir. 1954):

> We think a jury system cannot be made to work if, after trials, verdicts may be attacked by such affidavits from jurors. Suppose it is to be shown that one juror took a nap, or that another refused to participate in the general discussion of the case at hand, or that another used bad language and thus intimidated more timid members of the jury. There is no limit to the number of attacks on a verdict which could be made if this kind of thing were permitted. Jurors are selected with care; they take an oath to perform their duty; and their verdict is not to be impeached by affidavits of this type.

Aside from several possible instances of outside contact, the testimony in this case, both in my view and in that of Judge Marsh, reveals nothing beyond the kind of attack which could be made by any juror following a long deliberation. Under the rule that a juror may not be heard to impeach his own verdict, I conclude as a matter of law that defendants are not entitled to a new trial on the basis of such attacks. Since the possible outside contacts have been found not to have constituted undue outside influence and not to have been prejudicial to defendants, a new trial must be denied on this ground as well.

## ORDER

In conformance with the above Memorandum Opinion, I deny the third attempt by attorneys William Kunstler and Margaret Ratner, representing defendants La Beet and Ballentine, to have me recuse myself; and it is

ORDERED that defendants' motion for a new trial is hereby DENIED.